MONROE, C. J.
Plaintiffs, Octavia Mary Chopin, wife of Thomas J. Wetta, Theresa Erances Chopin, wife of Albert Kinlock Falconer, Leon Frederick Chopin, and Jean Baptiste Joseph Chopin, all children and heirs of Gustave Chopin and Erances Rouyer, his wife, both deceased, prosecute this suit against their brother and coheir, Peter A. Chopin, for an accounting and for the recovery of their alleged four-fifths interests in the business conducted by him, in the proceeds of certain real estate, inventoried and sold in the succession of their father, of other real estate acquired by defendant, in his own name, and alienated by him, and in certain other real estate, so acquired, and still standing in his name; the allegations upon which the prayer of the petitioners is predicated being, in effect: That their father, who was engaged in business as a florist and landscape gardener, died in 1892, ieaving a widow, who was wholly illiterate, and five children, of whom defendant was 17 years of age and the eldest, and the others, plaintiffs herein, were 15, 13, 9 and 6, years of age, respectively; that, though the widow tooli out letters of administration, she intrusted the actual administration of the estate to defendant; that he has since then continued and is now continuing to conduct the business of their father in his own name, without accounting to them with respect to, and without having acquired their interests in, the same; that the father died leaving five lots of ground in square 263, bounded by Camp, Berlin, Milan, and Chestnut streets, and two lots in the square bounded by Willow, Clara, Second, and First streets; that on July 12, 1892, defendant, through their mother, as administratrix, provoked the sale of the Willow street property, for the payment of the debts of the succession, received the proceeds, amounting to $501, and has never accounted for same; that on August 1, 1896, acting through said administratrix, as his “tool and mouthpiece,” he provoked the sale of three of the Camp street lots for the payment of a pretended indebtedness of the succession to him of $1,972.03; that said alleged debt was “fraudulent, fictitious, and not due, has never been recognized or adjudicated in any form in said proceedings of their father, and no account filed therein” ; that said lots were, none the less, adjudicated to defendant at the price of $1,850, which was set off by a like amount of said alleged debt, the whole proceeding being in pursuance of a fraudulent scheme, conceived by defendant, to appropriate to himself the entire estate of his father and mother, and the result of the carrying out of which has been that petitioners have received nothing from the succession of their parents save their interest in two of the lots in square 263, while defendant has accumulated a considerable estate, consisting partly of the property and business of their father and partly of the earnings and accretions thereto *639 in the hands of defendant, for all of which he should be held to account.
“Petitioners aver that the following constitutes the real estate bought by the said Peter A. Chopin from the money and the proceeds of the property and business of their said father which he continued to conduct after the death of their said father without any right to the ownership thereof and which said business he was conducting for their account and benefit.”
And then follow the descriptions of 12 different pieces of real estate, alleged to have been acquired by defendant, and some of them to have been sold again at various dates during the years from 1895 to 1912, inclusive.
Defendant pleaded exceptions of no cause of action, prescription, and estoppel, and answered, in effect, that he conducted the business of his father but a short time after his father’s death, for which he made a settlement with the administratrix, and that, since then, he has been carrying on a business of his own, in which plaintiffs have had no interest.
The questions presented involve mainly issues of fact, upon which the judge a quo, as we infer, found for the defendant, since he rejected plaintiffs’ demands, at their cost. Plaintiffs have appealed, and defendant has answered praying for a more definite ruling upon his exception.
We find the facts to be as follows:
Gustave Chopin died February 7, 1892, leaving a widow and the five children who are' now before the court, and who were minors, aged, approximately and respectively: Peter, 18; Octavia, 15; Theresa, 13; Leon, 9; and Joseph, 6 years. He left an •estate, in community, consisting of movables, appraised at $261, and immovables, appraised at $2,000, and debts to the amount of about $2,000; of which $1,000, with probably some accrued interest, was represented by mortgage and vendor’s lien notes, given in payment of three-fourths of the purchase price ■of four (out of five) of the lots in square 263, and other amounts were represented by bills for rent, bread, milk, etc., with respect to which the family seem to have fallen behind by reason of the fact that the decedent had suffered a stroke of paralysis some seven months prior to his death. The succession was opened by the widow, who qualified as administratrix. The notary, who appears to have known her well, says, in his testimony:
“Mrs. Chopin was not an ignorant woman. She was an illiterate woman. She had no education. But she was a woman of strong character and good common sense. * * * Oh, yes; Mrs. Chopin was very familiar with everything” (relating to the condition of the estate of her husband).
The defendant was the eldest of the minors and had been working with his father, and, during the illness of the father, had been in charge of the business; and, as he appears to have been intelligent and efficient, his mother, naturally, looked to him as her main support in the trouble which had come upon her, since the next in age were the two girls, of 15 and ID, respectively, while the other two boys were, the one 9, and the other but 6, years old. At the suggestion of the notary, who seems also to have been a friend of the family and to some extent their legal adviser, an advertisement, bearing defendant’s signature, was inserted in the newspaper, to the effect that the business of the decedent would be continued for the benefit of the family; and defendant undertook to continue the business in that way. Although, however, the decedent had held himself out as a “florist, horticulturist and landscape garden^ er,” and was doubtless well entitled to 'do so, the main business in which he was, and had always been, actually engaged, was (to use the language of one of the witnesses) “gardening on the outside, jobbing, contracting and doing new yards and all kinds of things like that” — a business which consisted, principally, of hard manual labor, such as digging in the ground with a spade or hoe, pushing a lawn mower, handling a wheelbarrow, *641 and the superintendence of the men employed to assist in that kind of work. But even that work required some capital, for the laborers had to be paid, though the collections might be delayed, and decedent left but $34.-63 in bank, and was behind in such payments at the time of his death. The family were obliged to leave the house in which they had been living, because of their inability to satisfy their landlord, who was also their baker, as to his past-due rent and bread bill, and were refused another, after the keys had been given to them and the girls had put it in order, because their credit was bad. It is not surprising, under the circumstances, that defendant should soon have realized that he had assumed a heavier burden than he could, or could reasonably have been expected to, carry. He was to do all the work, under the disadvantage of acting as agent, though a minor, for a practically insolvent succession, and the product of his labor was to be divided in the proportion of nine-tenths to his mother and sisters and brothers and one-tenth to himself.
On the other hand, he found that people were more willing to deal with him personally than as such agent, and he therefore, at the end of about three months, again consulted his mother and the notary, and his mother readily consented that he should go on with the business in his own' name and for his own account and that he might make use, for that purpose, of a horse and wagon and of certain gardening implements belonging to the succession. The horse gave out in a short time, and was sold, with the consent of Mrs. Ohopin, for $10, which was turned over to her, and the wagon and implements were not worth more than $100, at the outside. It appears to have been understood that defendant was to do his best to placate the creditors of the succession, to keep the property from being sold at a sacrifice, and to maintain the family and keep it together; and it may be here stated that he did those things. The debts of the succession were gradually paid, the family was kept together in a home of their own, the girls were there maintained until they were married, and the boys were there maintained, and sent to school, until they arrived at the ages of 15 and 16 years, respectively, when, still living at home, they were employed by defendant and paid such wages as they were able to earn. The amounts paid out by defendant for the clothing and shoes of his sisters and brothers were charged to them and were accounted for by them, when they married or attained majority; that is to say, he released the debt of one sister, as a wedding present, and was paid by the other, because he thought that he had previously given her the equivalent in some other form, and the boys repaid him in money or .work. But he was not reimbursed, nor has he asked to be reimbursed, the amount expended during a number of years for the maintenance of the family, and which he estimates at $6,000 or $8,000.
Defendant started in business for himself, probably, in May, 1892 (the exact date not being fixed by the testimony), and took an office that his father had once occupied, in a carpenter shop, at Third and Magazine streets; the premises in square 263 (which we shall call the Camp Street property) being then occupied by a tenant, named Lagrue, to whom it had been rented by the administratrix. Soon afterwards, it became necessary to pay some of the more pressing debts of the succession, and the administratrix petitioned the court to order the sale of the two Willow Street lots, which were appraised at $200, but for which defendant had found a purchaser who was willing to bid $500! To the petition was attached a statement showing the following debts, to wit: Expenses of last illness, $85; funeral expenses, $121; notes secured by mortgage on Camp *643 Street lots, $1,000; taxes, $74; expenses of administration, $150; note (for money borrowed. from an employé) to John T. Dubos, $90. And tbe lots were sold for $501.
To the amount thus realized, there appears to have been some addition, from other sources, making a total of $972.69, with which the immediate necessities of the occasion were tided over, and the debts that were not paid therefrom were taken care of, and paid, within the succeeding four years, by defendant, together with certain other bills that were incurred during those years. On August 1, 1896, the administratrix filed another petition, alleging “that the estate owes a debt of $1,972 to P. A. Chopin, being disbursements made by him for account of the estate, as per detailed statement hereto annexed,” and praying for an order for the sale of three of the Camp Street lots, and the order was given, and the sale made, accordingly ; the adjudicatee being the defendant, and the price being $1,850. The detailed statement annexed to the petition is signed by the defendant, and was evidently intended to serve, at once, as a statement of account between him and the administratrix and between the administratrix and the succession. It shows the total amount ($972.69) which had been received for account of the succession, and the various debts and charges in payment of which that amount had been disbursed; the disbursements exceeding the receipts by $24.88, which had been advanced by defendant. It shows further payments, for which defendant had advanced the money between February 1, 1893, and, say, June 26, 1896, as follows, to wit: Addition and repairs to house, $375; curbing, $57.40; sidewalk, $145.15; 112 loads of filling, $33.60; 20 loads of filling, $46; three (mortgage) notes, with interest, $1,330. In explanation of the item of $375, it may be said that there was, on the Camp Street lots, or one of them, a three-room house, which, in view of the difficulty that was experienced in renting a house, it was decided should be enlarged, by the addition of one room, and repaired, and occupied by the family, and the $375 was spent in the enlarging and repairing. The evidence is, however, conclusive and uncontradicted to the effect that, time and again, whenever one of the plaintiffs attained majority, an informal family meeting was convened, attended by the family friend, the notary, and the account in question was explained and gone over to the satisfaction of all present; and we are of opinion that the conduct of the plaintiffs, in alleging “that the said debt” (referring to the balance of $1,972.-03, shown by the statement in question to be due to defendant) “was fraudulent, fictitious, and not due,” and yet failing upon the trial either to withdraw, or to offer a syllable of evidence in support of, that allegation reflects severely upon their good faith in the prosecution of this suit, since it is evident that they must have known, in making it, that the allegation was equally untrue and unjust.
It is shown that, shortly after the death of his father, defendant found considerable profit in treating orange trees for a disease which had appeared among them; and that, somewhat later, co-operating with others, he made money in buying and selling real estate, usually pieces which required the investment of no large amounts of cash. In the meanwhile, he had developed the business of cultivating, at Ms own establishment, of buying and selling, flowers and plants, and of floral decoration, at entertainments, ceremonies, etc., and, in 1900, he bought lots and opened a place at the corner of Magazine and Eighth streets, where that business increased to such an extent that he concluded to give up, entirely, the business of attending to the gardens and lawns of customers, which, in 1905, he sold to his brother Leon (who had recently married) for $150; and Leon thereafter sold an interest to the younger brother, Joseph, and the business was conducted by them under the name of “Chopin Bros.,” for perhaps *645 two or three years, when it proved a failure, although it is admitted that it was more prosperous when Leon acquired it, in 1905, than when defendant took it over, in 1902, and, though they borrowed $400 to start with, wheréas defendant had but $18. The $150 was paid, at some inconvenience (as we infer from the testimony), in installments, which were taken from collections, as paid by different patrons whose lawns or gardens were kept in order, and the $400 was borrowed from the notary, and yet the two brothers, Leon and Joseph, adhere to the theory that the business thus purchased by them was dealt with as an asset of the estate of their father, which defendant was holding and administering for account of the widow and heirs, and in which they (Leon and Joseph) had an interest as heirs. They testify that.the amounts received by them while working under defendant (from $25 to $50 per month) were not paid or received as wages, but as allowances from the estate; that they accepted those amounts on that account, and in order that, upon the final settlement, there might be more left in the estate for division; and that they could have made $75 or $85 per month doing the same work elsewhere; and yet, when they took the business themselves, they failed in it within but a short time, and, when they failed, they did not find, or seek, so far as we are informed, the work to which they refer, but accepted positions as motormen, at $60 per month, or less. There are witnesses, however, who testify that the brothers told them that they were working for Peter, that Peter had a good business, and was well able to get married, etc. The sisters, also, adhere to the theory that all that defendant has been doing in the way of business, since the death of their father, has been as the agent of the widow and heirs; that, though they have known that he was conducting his business in his own name, and according to his own views, he has always admitted that it was being conducted for the benefit of the estate; and that such admissions were made at the family meetings to which we have referred. We find an exception, in that respect, in the testimony of Mrs. Wetta, whom defendant appears to have called to the stand, unexpectedly, as we infer, as upon cross-examination, and who then testified, in part, as follows:
“Q. When did you first conceive the idea that you bad an interest in Peter’s business? A. After Papa died; we always felt there was an interest in it for us. Q. When did you first make a demand on Peter for a settlement of the business with you? A. When I was 21 years old. Q. What sort of demand did you make on him? A. I went to Peter and said: ‘I am 21 years old, and married, and I would like to have the portion of the estate that is coming to me.’ And Peter said to me: What do you want to do that for? Don’t go and take it, now; wait ’til the younger children get older, and we will all come together, and I will make a settlement with you.’ * * * Q. When the youngest child became of age — Peter said when the youngest child became of age, he would make a settlement. Did you go to Peter and demand a settlement? A. Yes, sir. Q. When was that? A. When Joe was 21 years old. That is about 8 years ago. That was before my mother’s death. Q. Was there any settlement made then? A. No, sir. Q. Why? A. Because there was no settlement made. * * * Q. What attempts did you make to get it, other than to ask Peter for it; what did you do when— A. We went to Peter and asked for our portion of the father’s estate. Q. What did he say? A. He always said there was nothing coming to us. Q. That was eight years ago? A. Yes, sir; and, at present, he says the same thing. * * * Q. You say he always denied it — that there was something coming to you? A. There is something coming to us. Mama always told us— Q. I am not asking you that, now. I am asking you what Peter told you. You say Peter always told you that there was nothing coming to you? A. Yes. Q. Who supported the family from the time your father died? A. My brother. Q. What brother? A. Peter.”
Tbe notary, who has since departed this life, testified, positively and emphatically, that, at the family meetings to which we have referred, there was never any suggestion that the business conducted by Peter was the business of the estate, and that the explanations that were made in regard to the estate always proved entirely satisfactory; *647 the fact being, as we apprehend, that plaintiffs have confused the question of the settlement of the estate with that of the status of the business conducted by Peter. Mrs. Wetta, for instance, attained her majority in 1898, after the Willow Street and the three Camp Street lots had been sold and the debts of the succession paid, and there was nothing left in the estate save the other Oamp Street lots, of which Mrs. Chopin had the usufruct. There was therefore no settlement of the estate to be made at that time with the children, or at any time afterwards until Mrs. Chopin died. In the meanwhile, the defendant had long been conducting a business of his own, the most prosperous part of which was a business that his father had never conducted, save in the most limited and casual way. In 1902 the plaintiffs herein (with the exception of Joseph, who was still a minor) executed an act (called a sale) whereby they conveyed to defendant their respective interests in- the rear portions of the Camp Street lots which were still left in the succession, in exchange for a portion of the lots in square 263, which had been sold to him in 1896 (or 1897). In 1905, defendant sold the business of outside gardening to his brother Leon, who paid for it as in the case of any other purchase, and who sold an interest in it to Joseph, as he would have sold any other property. And, in 1910, all the parties before the court joined in a petition praying to be put in possession of the estate of their mother, to which petition there is attached the affidavit of Leon Chopin, to the effect that the decedent left no other property than the lot of ground described in the petition, being the lot made up from the original Camp Street property, as hereinabove appears.
Plaintiffs’ counsel argue that defendant could not have acquired, and never did acquire,' as his own, the business that his father was conducting. We must, however, first distinguish between the business of outside gardening, upon the one hand, in which Gustave Chopin was engaged, and the business of cultivating in his own garden, and dealing in, plants and cut flowers and the business of floral decoration, in which alone defendant was engaged when this suit was brought, upon the other hand, and in which his father was never engaged to any appreciable extent. As to the business last mentioned, the plaintiffs have not a color of standing. As to the business first mentioned, it is true that, under ordinary circumstances, one cannot, of his own motion, make hiihself the owner of that which he has received in the capacity of agent or fiduciary; but the circumstances under which defendant acted were not ordinary, and he cannot be said to have acted of his own motion, or so much even for his own advantage as for the advantage of the plaintiffs now before the court, and of the mother of them all, with whose consent and approval he, at first, attempted to conduct the businesá in question in the capacity of agent, for, and in behalf of, the estate, and then, with the same consent and approval, undertook to conduct it for his own account, as being the only way in which it could be either saved or conducted to the advantage of any of those who were interested. It is evident that, if defendant and his mother had allowed matters to take the ordinary course, the property of the succession would have been sacrificed at forced sales, for an insufficient amount to pay the debts, and the whole family would have been thrown homeless, upon the charity of the world, unless the two mentioned had found means to provide for them in some other way. It is equally evident, we think, that the good will of the business in which Gustave Ghopin was engaged would have sold for nothing, for a number of witnesses, who are familiar with that business, testify that it is worth nothing, because of the difficulty in making effective delivery, and where the sheriff makes such a sale, for a succes *649 sion, the difficulty amounts to an impossibility. The defendant therefore, in assuming the business in question, deprived the plaintiffs of nothing that could possibly have been of the slightest value to them, save as thus assumed, but which, in that way, served as the means of sheltering and keeping them, as one family in a home of their own, until they were able to provide for themselves, or, in the ease of the girls, were sought by good husbands who provided for them. Beyond that, the defendant was not bound to continue in a position in which all the work and but one-tenth of the product fell to his share, and he declined to do so. The good will of the business in which his father had been engaged, then, became derelict, and was open to appropriation by any one who chose, or might be able, to appropriate it; and he, having an interest in it, as heir, was within his rights and within the canons of the law, legal and moral, when he did appropriate it, for the purpose and with the effect of giving his coheirs such benefit from his action as he is shown to have given them. The view thus taken of the matter renders it unnecessary that we should consider the exceptions, but we do not wish to be understood as holding that they are without merit. The judge a quo properly rejected plaintiffs’ demands, and his judgment is affirmed.